# IN  THE  UNITED  STATES  DISTRICT  COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA

PLAINTIFF UNDER SEAL

v.

DEFENDANT UNDER SEAL

No.

JURY TRIAL DEMANDED

## COMPLAINT

## FILED IN CAMERA AND
## UNDER SEAL PURSUANT TO
## 31 U.S.C. § 3730(b)(2)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA*,*
*ex rel.* Robert V. Smith,

      Qui Tam Plaintiff,

      v.

JAY A. ODOM,

      Defendant.

No.

JURY TRIAL DEMANDED


## **COMPLAINT**

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

### INTRODUCTION

1.      Qui Tam Plaintiff Robert V. Smith brings this action on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA") against Defendant Jay A. Odom for having committed fraud on the United States Treasury ("Treasury") and its Troubled Asset Relief Program ("TARP").

2.      As detailed with particularity below, from 2011 through at least 2017, Defendant concocted and executed schemes to defraud Regions Bank, a subsidiary of Regions Financial Corporation ("Regions Bank"), and CRE/ADC Venture 2013-1, LLC ("CRE/ADC").

3.      Defendant committed his fraud by deceiving Regions Bank and CRE/ADC as to his true financial capacity to repay the loans and his relationship with a straw man who secretly acted on his behalf in purchasing the loans.  In doing so, Defendant employed a web of corporate entities, straw men, sham transactions, and outright falsities.

4.      All the while, Defendant enjoyed significant profits and demonstrated liquidity through successful business transactions with other companies that he controlled and that he concealed from the banks.

5.      During the time that Defendant was carrying out this fraud, the United States Treasury had a $3.5 billion equity interest in Regions Bank as a result of its investment of TARP funds intended to stabilize the bank following the financial crisis of 2008.   By submitting false statements and claims to Regions Bank, Defendant directly defrauded the Government by causing it to receive less than it was entitled to under the contracts at issue during that time.

6.      Moreover, Defendant caused Regions Bank—which relied upon Defendant's information—to supply false statements and claims to the United States as part of its TARP obligations.

7.      Similarly, Defendant's fraud upon CRE/ADC occurred at a time when the company was organized and operated by the Federal Deposit Insurance Corporation ("FDIC") to service the notes and mortgages of the failed GulfSouth Private Bank.   By submitting false statements and claims to CRE/ADC, Defendant directly defrauded the Government and caused the submission of false statements and claims to the Government by CRE/ADC.

8.      Accordingly, the United States is entitled to recover civil penalties plus three times the amount of damages which the Government sustains because of the acts of Defendant.   31 U.S.C. § 3729(a)(1).

## PARTIES

9.      Qui Tam Plaintiff Robert V. Smith is a citizen of the United States and is domiciled in Florida.

10.     On information and belief, Defendant Jay A. Odom is a resident of Florida.

11.     During the relevant time period, Defendant managed, served as the sole corporate officer, and/or effectively controlled the following companies:

(i)     Freeport 860, LLC;
(ii)    Waters Edge Building Company;
(iii)   HCB/Freeport Acquisition, LLC;
(iv)    Medallion Land Holdings, LLC;
(v)     Sterling Diversified, LLC;
(vi)    S.O. Investments Freeport, LLC;
(vii)   American Eagle Diversified, LLC;
(viii)  Genre Holdings, LLC; and,
(ix)    Crystal Beach Development Company of Northwest Florida.

12.     As will be further described herein, Defendant used these companies and a straw man to conceal his identity and effectuate his scheme.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under 31 U.S.C. § 3729 *et seq*.

14.     This Court has personal jurisdiction under 31 U.S.C. § 3732(a) because, *inter alia*, a substantial part of the events or omissions giving rise to the

claims at issue occurred within this judicial district, and Defendant transacted business and committed acts proscribed by the statute within this judicial district. In addition, many witnesses with information relevant to this matter reside or conduct business in this judicial district, and much of the evidence relevant to this matter is located in this judicial district.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)–(c) and 31 U.S.C. § 3732(a) because a substantial part of the events or omissions giving rise to the claims at issue occurred within this judicial district, and Defendant transacted business and committed acts proscribed by the statute within this judicial district.

## STATUTORY AND REGULATORY FRAMEWORK

### A.   The False Claims Act

16.     The False Claims Act provides that any person or entity that individually, or in concert with others, knowingly presents, or causes to be presented, a false claim for payment or approval, or a false statement that is material to a claim for payment or approval, is liable to the United States for penalties and treble damages.   *See* 31 U.S.C. §§ 3729(a)(1)(A)–(C).   The statute similarly provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly

avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for penalties and treble damages.  *See* 31 U.S.C. § 3729(a)(1)(G).

17.     "Knowingly" means that the person or entity: (i) had actual knowledge of the information; (ii) acted in deliberate ignorance of the truth or falsity of the information; or, (iii) acted in reckless disregard of the truth or falsity of the information.  *Id*. § 3729(b)(1)(A).  The person need not have acted with the specific intent to defraud the United States to be liable under the FCA.  *Id*. § 3729(b)(1)(B).

### B.     Regions Bank, TARP, and the Capital Purchase Program

18.     Congress created TARP in response to the financial crisis of 2008. The legislation was intended "to immediately provide authority and facilities that . . . the Treasury can use to restore liquidity and stability to the financial system of the United States."  Emergency Economic Stabilization Act of 2008 ("EESA"), Div. A, § 2, 122 Stat. 3765.  EESA authorized Treasury, through TARP, to purchase troubled assets from any financial institution.

19.     EESA established the Office of Financial Stability ("OFS") within Treasury to administer the program.  EESA required OFS to distribute TARP funds in a manner that, among other things, preserved homeownership, promoted jobs, promoted economic growth, maximized overall returns to the taxpayers of the

United States, and provided public accountability for the exercise of such authority. The Capital Purchase Program ("CPP") is a component of TARP under which Treasury invested capital in financial institutions in exchange for preferred stock or debt securities.

20.    From late 2008 through 2009, Treasury invested approximately $205 billion of CPP funds in more than 700 financial institutions nationwide.

21.    Participation in CPP was voluntary.  A financial institution wishing to participate submitted an application to its primary federal regulator for a capital investment of a particular amount.  If the application was approved by the regulator and was then approved by Treasury, the applicant entered into an agreement with Treasury in which the financial institution would make numerous representations, warranties, and recitals about, *inter alia*, its financial condition and intentions for the use of the funds.

22.    The representations contained within the financial institution's TARP application, and, if approved, the representations made in the stock or securities purchase agreement between the financial institution and Treasury, were material to Treasury's decision to invest in the financial institution.   These statements referenced periodic disclosures and reports that the financial institution submits to regulators.   For banks, such reports are referred to as Call Reports or Thrift

Financial Reports ("TFRs") and were submitted to the Office of the Comptroller of the Currency ("OCC") or the FDIC.

23.     In evaluating a TARP application and reviewing periodic disclosures, Treasury balanced the need to provide effective assistance to the troubled financial institution with efficient deployment of taxpayer funds.  To strike that balance, Treasury relied on the veracity of the applicant's representations.

24.     Regions Bank, a subsidiary of Regions Financial Corporation, was one such bank that received funds through the TARP CPP.  In 2008, Treasury purchased approximately $3.5 billion in Regions Bank's preferred stock under TARP. Regions Bank remained in the TARP CPP through 2012, at which time Regions Bank repurchased its outstanding preferred stock.

25.     Thus, at the time Defendant committed the fraud described herein, the United States directly owned a $3.5 billion equity interest in Regions Bank, and Regions Bank submitted applications and statements to the Government concerning its financial status that incorporated information from its clients, including Defendant.

### C.     <u>CRE/ADC Venture 2013-1, LLC</u>

26.     GulfSouth Private Bank was a financial institution in Destin, Florida. On October 12, 2012, the Florida Office of Financial Regulation announced that it

had closed GulfSouth Private Bank and appointed the Federal Deposit Insurance Corporation as Receiver.

27.     In October 2013, the FDIC as Receiver assigned Defendant's note, as described in detail below, to CRE/ADC Venture 2013-1, LLC, a Delaware limited liability company organized by the FDIC as part of a structured transaction.  FDIC was the majority owner of CRE/ADC with an 80% interest as of at least October 17, 2013.  This relationship required CRE/ADC to submit application and statements to the Government concerning the application of Government funds.

28.     Thus, at the time Defendant committed the fraud as described herein, the United States owned a substantial interest in  CRE/ADC, and CRE/ADC submitted applications and statements to the Government concerning its financial status that incorporated information from its clients, including the Defendant.

### D.     Qui Tam Plaintiff's Personal Knowledge

29.     Qui Tam Plaintiff was previously involved with a company that engaged in a joint venture with companies owned and/or operated by Defendant. This joint venture lasted until approximately December 31, 2006.

30.     Based upon his personal knowledge of Defendant and Defendant's companies, and his recognition of Defendant's questionable practices, Qui Tam Plaintiff began investigating Defendant's transactions.  Qui Tam Plaintiff's unique

familiarity with the property and debts involved through his prior business relationship with Defendant allowed him to uncover the fraudulent schemes executed by Defendant as described herein.

31.    Qui Tam Plaintiff is an original source of the fraud executed by Defendant.   The allegations are not based entirely upon publicly-disclosed information.

## THE SCHEME

32.    In 2006 and 2007, Defendant took out large loans from Regions Bank and GulfSouth Private Bank.  When GulfSouth Private Bank failed, that loan was assigned to an entity owned largely by the FDIC and known as CRE/ADC Venture 2013-1, LLC.  These loans were taken out in the names of entities controlled by Defendant and personally guaranteed by him.  Having initially accepted responsibility for the repayment of these loans, Defendant put together an elaborate scheme to evade his repayment obligations.

33.    The object of Defendant's scheme was to force the banks to sell the loans at a substantial discount to someone they believed to be an independent third-party but who was, in reality, a straw man secretly acting on Defendant's behalf. Once Defendant had control of the loans, he would arrange to have the debts eliminated.

34.     In order to induce the banks to sell the loans, Defendant needed to convince them that he was incapable of meeting his obligations.  He accomplished this by hiding from the banks his true financial capacity.

35.     Defendant hid this information from the banks in a number of ways.  He hid from them very lucrative endeavors in which he was involved; he caused to be filed in the public records sham sales of properties he owned and which had been given as security for the loans for the purpose of convincing the bank that their security and his assets were worth less than they actually were; and he provided false financial information to the banks on his net worth and the value of his assets.

36.     Defendant knew that the banks could not and would not sell the loans back to him at a substantial discount.  Therefore, he engaged a straw man who, unbeknownst to the banks, was actually acting on Defendant's behalf.  The same straw man was used with both banks.  That straw man purchased the loans at large discounts and either immediately cancelled the debts or quickly transferred them to entities controlled by Defendant so that the debts could be promptly extinguished.  In this way, Defendant evaded over $5 million in debt obligations to Regions Bank and over $1 million in debt obligations to CRE/ADC.

37.    Because the United States had a $3.5 billion equity interest in Regions Bank and majority ownership in CRE/ADC, Defendant's frauds fall within the purview of the False Claims Act.

## SPECIFIC ALLEGATIONS AS TO FRAUD ON REGIONS BANK

### A.    Origination of the Regions Bank Note and Mortgage

38.    On May 10, 2006, Freeport 860, LLC and Bay Loop Land Company, Inc. executed a note and mortgage with Regions Bank for a principal sum of $12,229,428.

39.    The purpose of this mortgage was to purchase and fund portions of a large-scale housing development in Walton County, Florida, known as Hammock Bay.  This included construction of (i) 106 lots at Whispers at Hammock Bay; (ii) 125 lots at Passages at Hammock Bay; and, (iii) the Lake Club and Fitness Center and two swimming pools at Hammock Bay.

40.    The collateralized land for the note consisted of approximately 98 acres of Hammock Bay property.

41.    Also on May 10, 2006, Defendant personally executed an unconditional personal guaranty on the Regions note.

42.    At that time, Freeport 860, LLC's two Managing Members were Waters Edge Building Company and Bay Loop Land Company, Inc.

43.     Defendant fully controlled Waters Edge Building Company as its President, Secretary, and Director.

44.     Defendant did not, however, fully control Bay Loop Land Company, Inc.  That entity's President was George Smith, and its Treasurer was the Qui Tam Plaintiff.

45.     However, after December 31, 2006, Bay Loop Land Company, Inc. was removed as a Managing Member of Freeport 860, LLC and released from the loan by Regions Bank.

46.     Thus, as of January 1, 2007, Freeport 860, LLC and the entirety of the Regions Bank loan were fully controlled by Defendant.

## B.   Orchestrated Default and Re-Purchase of Regions Bank Loan Through Shell Companies and Straw Man

47.     In approximately 2010, Freeport 860, LLC defaulted on the Regions Bank note.

48.     Defendant repeatedly tried, without success, to negotiate a reduction in the principal balance owed on the note held by Regions Bank.

49.     On November 19, 2010, Freeport 860, LLC renewed the note via a First Mortgage Modification Agreement.  The new loan was broken into two parts: Renewal Note A and Renewal Note B.

50.   Renewal Note A was a Renewal Promissory Note executed by Freeport 860, LLC and payable to Regions Bank in the principal amount of $5,072,000. Renewal Note B was a Renewal Promissory Note executed by Freeport 860, LLC and payable to Regions Bank in the principal amount of $5,267,436.81.  The aggregate principal sum of Renewal Note A and Renewal Note B thus equaled the unpaid principal balance of the prior note of $10,339,436.81.  All security agreements, including the personal guarantee signed by Defendant in an individual capacity, applied to Renewal Note A and Renewal Note B (collectively, the "Renewal Notes").

51.   Shortly after the renewal, Freeport 860, LLC went into default on the Renewal Notes.

52.   In spite of Defendant having funds available as further described herein, neither Defendant nor his company Freeport 860, LLC paid Regions Bank what it was owed.  Instead, Defendant set in motion his scheme to deceive Regions Bank.

53.   Having been convinced by Defendant that he could not repay the loan, Regions Bank sold the now-defaulted Renewal Notes to HCB Financial Corp. on December 21, 2011.  The Renewal Notes were purchased at a substantial

discount of approximately $5 million. The assignment was signed for by Fred McLaughlin, HCB Financial's Vice-President.

54. Unbeknownst to Regions Bank, Fred McLaughlin—acting through a company under his control, HCB Financial Corp.—was acting as a straw man on behalf of Defendant.

55. Defendant's concealment of McLaughlin's role as a straw man was a material fact that he deliberately withheld from Regions Bank.

56. In furtherance of the scheme, HCB Financial Corp. assigned the Renewal Notes to HCB/Freeport Acquisition, LLC on the same day it acquired them. Fred McLaughlin signed both sides of the assignment—both as HCB Financial's Vice-President and as HCB/Freeport Acquisition, LLC's Manager.

57. HCB/Freeport Acquisition, LLC was a company formed by Defendant on December 12, 2011, nine days before the straw purchase and conveyance. The Managing Member of HCB/Freeport Acquisition, LLC, was Sterling Diversified, LLC, a company controlled by Defendant.

58. Defendant consequently controlled HCB/Freeport Acquisition, LLC, and therefore also controlled the Regions Bank Renewal Notes.

59. Having now acquired the Renewal Notes through a straw man on December 12, 2011, and thereby eliminating Regions Bank's lien on the property,

Defendant sold 190 lots from the Hammock Bay Development for $4,577,000 on February 9, 2012.  Those lots were part of the collateral on the Regions note.

60.   Defendant was able to reap the proceeds of this sale only because he had successfully deceived Regions Bank as to his ability to repay the notes.

61.   Thus, by deceiving Regions Bank as to (i) his ability to repay the loans; (ii) the true value of the security for the loan; and, (iii) the use of a straw man, Defendant orchestrated and completed the re-purchase of the same loan from Regions Bank at a significantly reduced price.

62.   The information that Defendant used to deceive Regions Bank was material to the bank in deciding how to resolve Defendant's debt obligations.

63.   This fraud caused losses to Regions Bank in excess of $5 million at a time when the United States government held a $3.5 billion equity interest in the bank.

64.   Thus, Defendant directly defrauded the United States by way of the Government's ownership of equity in Regions Bank.

65.   Moreover, Defendant also defrauded the United States by supplying materially false statements and claims to Regions Bank—including but not limited to Defendant's scheme to conceal the role of the straw man and Defendant's own true financial worth.   This information and/or lack of

information, in turn, was supplied to the United States by way of Regions Bank's TARP and CPP obligations.

66.     Defendant thus caused Regions Bank to submit false records or statements material to a false or fraudulent claim to the United States in connection with the bank's application for and continuing verification of use of TARP funds.

67.     Defendant's scheme or artifice to defraud Regions Bank, even absent an independent duty to disclose, constituted misleading or deceitful conduct designed to conceal material information from the financial institution.   Thus, Defendant is liable under the False Claims Act.

## SPECIFIC ALLEGATIONS AS TO FRAUD ON CRE/ADC VENTURE 2013-1, LLC

### A.     Origination of the CRE/ADC Venture 2013-1, LLC Note and Mortgage

68.     On January 17, 2007, Freeport 860, LLC—an entity controlled by Defendant—obtained a $3,850,000 mortgage from GulfSouth Private Bank.

69.     That same day, Defendant, in an individual capacity, executed a personal guaranty on the full of amount of that $3,850,000 loan.   That loan was secured by lots in the Hammock Bay Development.

70.    In or about November 2013, Defendant defaulted on that note issued by GulfSouth Private Bank.

71.    By that time, due to financial issues with the bank, the Florida Office of Financial Regulation had closed GulfSouth Private Bank and appointed the FDIC as its Receiver.   In October 2013, the FDIC as Receiver assigned the note to CRE/ADC.

## B.    Orchestrated Default and Debt Cancellation of CRE/ADC Venture 2013-1, LLC Bank Loan Through Shell Companies and Straw Man

72.    On September 15, 2016, CRE/ADC filed a foreclosure action against Defendant and companies under his control.

73.    Before Defendant's default and during Defendant's attempts to resolve his outstanding debt—and unbeknownst to CRE/ADC—Defendant was enjoying significant profits from other business transactions as further described herein. Defendant concealed those profits and the resulting liquidity from CRE/ADC.

74.    Defendant never paid the now-defaulted note despite those profits.

75.    During this same time, Defendant used other corporate entities to deceive CRE/ADC as to his ability to repay his loan and the value of the security he had provided for the loan.

76.    For example, on December 28, 2016, American Eagle Diversified, LLC—a company under Defendant's control—sold a lot in the Horseshoe Bend

subdivision to Emerald Coast Premier Builders, LLC for $25,000. This was a sham transaction designed to deceive CRE/ADC as to his ability to repay the loan. Emerald Coast Premier Builders was managed by George D. Palmer, an associate of Defendant. The purported $25,000 price was below market price and was designed to disguise the true value of the other lots owned by companies controlled by Defendant. The transaction was not an arms-length transaction. This transaction was recorded while Defendant was trying to convince CRE/ADC that he could not repay the loan and that they should sell the note at a discount.

77.    On September 15, 2017, CRE/ADC Venture 2013-1, LLC sold the GulfSouth loan to McLaughlin Properties, LLC—a company controlled by Fred McLaughlin—at a substantial discount. McLaughlin was secretly acting as a straw man for Defendant.

78.    Had CRE/ADC known that McLaughlin was a straw man acting on Defendant's behalf, it would not have sold the loan as such. This was a material fact that Defendant concealed from CRE/ADC.

79.    On September 25, 2017, ten days after the CRE/ADC loan had been sold to Defendant's straw man, the straw man executed a full release and cancellation of mortgage—thereby releasing Defendant from his financial obligations under that loan.

80.     McLaughlin Properties, LLC was substituted as plaintiff in the pending default action against Defendant on September 26, 2017, and dismissed the lawsuit the very next day.

81.     Thus, Defendant avoided liability on his debt to CRE/ADC Venture 2013-1, LLC through the use of the straw man, resulting in losses in excess of $1 million to CRE/ADC Venture 2013-1, LLC.

82.     Approximately one month after the note had been sold to the straw man, Defendant arranged for a company he controlled to purchase the Horseshoe Bend lot back from Palmer for $35,000—$10,000 more than the original purchase price.

83.     At all times relevant, McLaughlin acted as a straw man on direction and behalf of Defendant.  Defendant concealed this information from CRE/ADC.

84.     McLaughlin, through his corporate entity, purchased the defaulted GulfSouth note from CRE/ADC Venture 2013-1, LLC at a discounted price and then cancelled that debt.

85.     Had CRE/ADC Venture 2013-1, LLC not been deceived as to the true net worth of Defendant and the role of the straw man, it would not have sold the defaulted loan on such favorable terms.

86.    These actions directly resulted in losses of more than $1 million to CRE/ADC Venture 2013-1, LLC and, in turn, the United States by way of the Government's involvement in that venture.

87.    Defendant also defrauded the United States by supplying false statements and claims to CRE/ADC—including but not limited to concealing the straw man.  Defendant thus caused CRE/ADC to submit false material records or statements material to a false or fraudulent claim to the United States in connection with FDIC's control of CRE/ADC.

88.    Defendant's scheme or artifice to defraud CRE/ADC Venture 2013-1, LLC, even absent an independent duty to disclose, constituted misleading or deceitful conduct designed to conceal material information from the financial institution.  Thus, Defendant is liable under the False Claims Act.

## EVIDENCE OF DEFENDANT'S TRUE FINANCIAL CAPACITY DURING RELEVANT TIME FRAME

89.    Defendant's true net worth and liquidity was significantly more than he was reporting to Regions Bank or CRE/ADC during the relevant time period of 2011 through 2017.

90.    During this period, Defendant concealed his true financial information and did not fully pay his debt obligations to Regions Bank and CRE/ADC.  Thus, despite being able to satisfy outstanding obligations, Defendant

remained in default and caused Regions Bank and CRE/ADC to sell the loans at significantly discounted prices—acts that the banks would not have taken but for Defendant's fraud.

91.    For example, on August 31, 2011, Defendant, through an entity he controlled, closed on the sale of his Uptown Station property in Okaloosa County for approximately $27 million.  Defendant paid off six mortgages on the Uptown Station property with original balances of approximately $17 million during that same time.

92.    On February 9, 2012, Freeport 860, LLC closed on the sale of 190 lots in the Whispers and Passages Subdivisions with D.R. Horton, Inc. for $4,577,000.  Those 190 lots were part of the collateral for the Regions Bank note that was assigned to HCB Financial Corp. and then to HCB/Freeport Acquisition, LLC.

93.    On July 21, 2014, Crystal Beach Development Company of Northwest Florida—wholly owned by Defendant—closed on a sale for real property in Fort Walton Beach, Florida for $13,300,000.  The company originally purchased that same property in 2000 for $2,105,000.

94.    On September 29, 2016, Genre Holdings, LLC—a company wholly owned by Defendant—closed on a sale for real property in Walton County, Florida

for $7,632,000.   The company originally purchased the property in 1998 for $700,000, and Defendant borrowed $2 million against the property in April 2016. Thus, Defendant's company obtained substantial profits from that transaction.

## DEFENDANT'S REWARDS TO STRAW MAN

95.    Fred McLaughlin was rewarded by Defendant for his participation.

96.    On February 20, 2012, McLaughlin purchased a lot in Hammock Bay for $8,000 from a company controlled by Defendant, Medallion Land Holdings, LLC.

97.    This $8,000 purchase price was significantly less than the prices at which Defendant was selling lots to other entities.   Defendant knew this information and purposefully intended to reward McLaughlin for his participation in the fraud described herein.

98.    On May 31, 2013, McLaughlin sold the same lot to Holiday Builders, Inc. for $18,000.  He thus turned a $10,000 profit.

## COUNT ONE

## Reverse False Claims as to Regions Bank,
## in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

99.    Qui Tam Plaintiff repeats and re-alleges paragraphs 1–98 as if fully set forth herein.

100.   Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G) through his actions related to Regions Bank as described *supra.*

101.   Because Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, the United States suffered damages.

102.   Defendant is therefore liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as determined by statute for each false claim presented or caused to be presented by Defendant.

## COUNT TWO

### False Statements as to Regions Bank, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

103.   Qui Tam Plaintiff repeats and re-alleges paragraphs 1–98 as if fully set forth herein.

24

104.   Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) through his actions related to Regions Bank as described *supra*.

105.   Because Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, the United States suffered damages.

106.   Defendant is therefore liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as determined by statute for each false claim presented or caused to be presented by Defendant.

## COUNT THREE

### Reverse False Claims as to CRE/ADC Venture 2013-1, LLC, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

107.   Qui Tam Plaintiff repeats and re-alleges paragraphs 1–98 as if fully set forth herein.

108.   Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in

violation of 31 U.S.C. § 3729(a)(1)(G) through his actions related to CRE/ADC Venture 2013-1, LLC as described *supra.*

109.   Because Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, the United States suffered damages.

110.   Defendant is therefore liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as determined by statute for each false claim presented or caused to be presented by Defendant.

## COUNT FOUR

## False Statements as to CRE/ADC Venture 2013-1, LLC, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

111.   Qui Tam Plaintiff repeats and re-alleges paragraphs 1–98 as if fully set forth herein.

112.   Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) through his actions related to CRE/ADC Venture 2013-1, LLC as described *supra*.

26

113.   Because Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, the United States suffered damages.

114.   Defendant is therefore liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as determined by statute for each false claim presented or caused to be presented by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, the Qui Tam Plaintiff demands and prays that judgment be entered in favor of the United States as follows:

1.   On Counts One, Two, Three, and Four, against Defendant for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper;

2.   An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

3.   Award of an amount for reasonable expenses necessarily incurred;

4.   Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

5.   Interest; and,

6.   Such further relief as the Court deems just.

## **JURY REQUEST**

The Qui Tam Plaintiff requests a jury by trial for all issues that may be tried by jury.

Respectfully submitted,

/s/ David L. McGee
David L. McGee
FL Bar No. 220000
dlm@beggslane.com
Matthew P. Massey
FL Bar No. 1008337
mpm@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, FL  32502
Telephone: (850) 432-2451
Facsimile: (850) 469-3331
*Attorneys for Qui Tam Plaintiff*
*Robert V. Smith*